UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| Jennifer Finley,<br>　　　　Plaintiff,<br><br>v.<br><br>Equifax Information Services, LLC; Conn Credit Corporation, Inc.; and DOES 1 through 100 inclusive,<br><br><br><br><br>　　　　Defendants. | § § § § § § § § § § § § § § § § § § | CASE NO. 4:20-cv-04321 |

## PLAINTIFF'S ORIGINAL PETITION

COMES NOW Plaintiff **JENNIFER FINLEY** ("Plaintiff"), an individual, based on information and belief, to allege as follows:

### INTRODUCTION

1.　This case arises under the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681s-2(b), 1681e(b), 1681i(a)(2)(A), 1681i(a)(4), and 1681i(a)(5)(A). Plaintiff seeks redress for the unlawful and deceptive practices committed by the Defendants in connection with their inaccurate, misleading, or incomplete reporting of Plaintiff's debt.

2.　Here, Defendant Conn Credit Corporation, Inc. ("Conn") is not reporting Plaintiff's account accurately as paid in full for less than full amount, despite acknowledging this fact via a payoff letter.

3.　The United States Congress has found the banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system and unfair credit reporting methods undermine the public confidence that is essential to the continued functioning of the banking system.

4. Creditors intentionally and routinely ignore industry standards for accurately reporting debt information. Creditors know that deviating from recognized credit reporting standards will make it difficult for consumers to raise their credit scores and improve their creditworthiness.

5. This was not the intent of Congress when it enacted the Fair Credit Reporting Act.

## JURISDICTION & VENUE

6. Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

7. This Court has jurisdiction under 28 U.S.C. §§ 1331, 1337, 1367, and 15 U.S.C. § 1681.

8. This venue is proper pursuant to 28 U.S.C. § 1391(b)(1).

9. Plaintiff alleges that, for purposes of establishing residency under 28 U.S.C. § 1391(b)(1), each of the named Defendants conducts sufficient business within the forum state and this Court has personal jurisdiction over each Defendant under 28 U.S.C. §§ 1391(c)(2) and 1391(d).

## GENERAL ALLEGATIONS

10. Plaintiff alleges that the Conn account was settled and legally paid in full for less than the full amount in April of 2020 and is not a charged off debt.

11. Plaintiff alleges that each and every Defendant is familiar with credit reporting industry standards and subscribes thereto.

12. Plaintiff alleges that each and every Defendant understands that deviation from credit reporting industry standards can, and often does, result in the denial of credit, higher interest rates, and prompts a negative inference that would not be drawn if the data were reported in accordance with the recognized industry standard.

13. Plaintiff alleges that all of Defendants' actions alleged herein were committed knowingly, intentionally, and in reckless disregard for credit reporting industry standards to purposefully undermine Plaintiff's ability to repair her FICO Score.

14. In the alternative, Plaintiff alleges that each and every Defendants' actions were the result of reckless policies and procedures that inevitably led to inaccurate, misleading, or incomplete credit reporting.

//

**FACTUAL BACKGROUND**

15.     Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.     FICO, Inc.**

16.     FICO is a leading analytics software company with its principal headquarters in San Jose, California. FICO has over 130 patents related to their analytics and decision management technology and regularly uses mathematical algorithms to predict consumer behavior, including credit risk.

17.     The FICO Score has become the standard measure of consumer credit risk in the United States and is used in ninety percent (90%) of lending decisions.

18.     A FICO Score consists of a three-digit number summarizing a consumer's credit risk or likelihood to repay a loan. FICO periodically updates its scoring models resulting in multiple FICO Score versions.

19.     Base FICO Scores range from 300 to 850, while industry specific FICO Scores range from 250-900. A higher FICO Score demonstrates lower credit risk or less likelihood of default.

20.     Different lenders use different versions of FICO Scores when evaluating a consumer's creditworthiness.

21.     There are twenty-eight (28) FICO Scores that are commonly used by lenders.

22.     A consumer's FICO Score is calculated based solely on information in consumer credit reports maintained at credit reporting agencies ("CRAs").

23.     The three largest CRAs are Experian Information Solutions, Inc. ("Experian"); Equifax Information Services, LLC ("Equifax"); and TransUnion, LLC ("TransUnion").

24.     FICO does not control what information is provided on a consumer's credit report. Instead, the scoring models, or algorithms, are based on the premise that the information provided by the CRAs is accurate and complies with credit reporting industry standards.

25.     There are five (5) key factors that a FICO Score considers: (1) payment history; (2) amount of debt; (3) length of credit history; (4) new credit; and (5) credit mix.

26.     Each of the five (5) factors is weighted differently by FICO.

27.     In other words, thirty-five percent (35%) of a consumer's FICO Score relates to payment history, thirty percent (30%) relates to the amount of debt, fifteen percent (15%) relates

to the length of credit history, ten percent (10%) relates to new credit, and the final ten percent (10%) relates to a consumer's credit mix, which is the different types of debts reported.

28. Payment history refers to whether a consumer has paid their bills in the past, on time, late, or missed payments. The more severe, recent, or frequent the late payment information, the greater the impact on a FICO Score. Public record items, such as bankruptcy, foreclosure, judgments, and wage garnishments are also considered part of a consumer's payment history.

29. In factoring the severity of delinquent payments, a FICO Score considers how late the payment continues to be, how much is owed, how recently this occurred, and how many delinquent accounts exist.

30. Once a delinquent account has been remedied, the longer the account stays current the more a consumer's FICO Score should increase.

31. FICO Scores are entirely dependent upon information provided by data furnishers ("DFs"), such as banks and other financial institutions, to CRAs.

32. The FICO scoring formula treats both Chapter 7 and Chapter 13 Bankruptcies similarly in terms of their impact on one's FICO Score. Specifically, both Chapters have the same level of severity with respect to their FICO Score and FICO uses the *filing date*, under both Chapters, to determine how long ago the bankruptcy took place.

**B.    Metro 2**

33. The Consumer Data Industry Association ("CDIA") is an international trade association representing the consumer credit, mortgage reporting, employment and tenant screening, and collection services industries.

34. The credit reporting industry has adopted a standard electronic data reporting format called the Metro 2 format. The Metro 2 format was developed by CDIA to universally report debts in a particular manner that is understood to be the most accurate in reporting a debt. In other word, the Metro 2 format was designed to allow reporting of the most accurate and complete information on consumers' credit history.

35. The CDIA's Metro 2 format is the credit reporting industry standard for accurate credit reporting.

36. The credit reporting industry at large depends upon the Metro 2 format and the CDIA's recommendations for reporting debt accurately.

//

37. The CDIA is *the* expert on accurate credit reporting. In support of this allegation, Plaintiff avers the following:

   a. The CDIA offers a FCRA certificate program for all CRAs.
   b. The CDIA offers a FCRA awareness program for all CRAs.
   c. The CDIA offers a FCRA certificate program for DFs.
   d. The CDIA offers a FCRA awareness program for DFs.
   e. The CDIA offers a Metro 2 learning system to provide detailed instructions on the use of Metro 2 format to ensure understanding of the reporting guidelines for each field of the Metro 2 format as well as the relationship between multiple fields.
   f. The CDIA hosts workshops developed and authorized by Equifax, Experian, Innovis, and TransUnion.
   g. The CDIA developed a credit reporting resource guide for accurately reporting credit.

38. The CDIA's Metro 2 format is accepted by all CRAs.

39. The credit reporting accepted industry standards for reporting Metro 2 accurately are found in the CDIA's credit reporting resource guide ("CRRG").

40. The CRRG outlines the industry standards for most accurately reporting debts using Metro 2 format.

41. The CRRG is not readily available to the public. It can be purchased for $229.45.

42. Even if a buyer is ready, willing, and able to pay for the CRRG, the CDIA will <u>not</u> grant access to the guide unless the buyer represents an organization included in the Metro 2 Access Policy.

43. When FICO calculates credit scores, the algorithms use Metro 2 information based on industry standards established by the CDIA.

44. The algorithms used by FICO in determining a consumer's credit score are premised on the Metro 2 data received comporting with the CDIA's recommendations for accurate credit reporting.

45. If the Metro 2 data received by FICO deviates from industry standards, an inaccurate or incorrect FICO Score results. If the resulting FICO Score is lower, a consumer will be considered a higher credit risk resulting in less favorable lending terms.

//

### C. e-OSCAR

46. e-OSCAR is the web-based, Metro 2 compliant system developed by Experian, Equifax, TransUnion, and Innovis that enables DFs and CRAs to create and respond to consumer credit disputes.

47. When a consumer sends a dispute letter to a CRA, the CRA then sends an automated credit dispute verification ("ACDV") via e-OSCAR to the appropriate DF.

48. The ACDV contains within it Metro 2 codes next to certain data fields associated with a credit file e.g., "Account Type" "07" (07 in Metro 2 refers to a Charge Account).

### D. Plaintiff's Credit Report Contains Inaccurate Adverse Tradelines, which Plaintiff Disputed to no Avail

49. On September 8, 2020, Plaintiff ordered a three-bureau credit report from Experian to ensure proper reporting by Plaintiff's creditors (the "September 8 Credit Reports").

50. Plaintiff noticed adverse tradelines in her September 8 Credit Reports, reporting inaccurate, misleading, or incomplete information that did not comply with credit reporting industry standards.

51. Plaintiff then disputed the inaccurate tradelines regarding the Conn account via certified mail to Equifax on or about October 26, 2020 (the "Dispute Letter").

52. Plaintiff's Dispute Letter specifically put Conn on notice that Plaintiff settled the account for less than the full amount, and should be updated to reflect the settlement.

53. Plaintiff's Dispute Letter included a copy of the payoff letter dated July 20, 2020 which she received from Conn (the "Payoff Letter").

54. Plaintiff requested that any derogatory reporting be updated to ensure accuracy and completeness of the accounts as required by the FCRA.

55. Plaintiff is informed and believes that Equifax received Plaintiff's Dispute Letter and, in response, sent Plaintiff's dispute to Conn, as the data furnisher, via an ACDV through e-OSCAR.

56. On December 2, 2020, Plaintiff ordered a second credit report from Experian to determine if her account was updated.

//
//
//

      a.      **Inaccuracy - Conn**

57. Despite actual knowledge, Conn continued to report Plaintiff's account, beginning in 502731XXX, to Equifax with a current payment status tradeline of "Charge-off" even though the account was legally paid or settled for less than the full amount in April of 2020.

58. Plaintiff alleges that Conn did not investigate whether Plaintiff previously settled the account.

59. Conn did not update the tradeline to reflect that Plaintiff settled the account for less than the full amount.

60. Equifax provided notice to Conn that Plaintiff was disputing the inaccurate and misleading information, but Conn failed to conduct a reasonable investigation of the information as required by the Fair Credit Reporting Act.

61. The most basic investigation would include a simple review of well-established credit reporting industry standards on how to report a debt legally paid or settled for less than the full amount.

62. Plaintiff alleges that Conn did not review well-established industry standards for credit reporting.

63. If Conn reviewed such standards, or its own internal records regarding Plaintiff's account, Conn would have seen that its reporting was not in compliance and was therefore inaccurate or incomplete.

64. The term "charge-off" means an account is closed, although the debt is still owed and may be sent to collections. By continuing to report Plaintiff's account with a current payment status tradeline of "charge-off", it incorrectly appears to third parties viewing Plaintiff's credit report that the account was not paid or settled for less than the full amount, which is inaccurate.

65. Conn's lack of investigation is unreasonable.

**E.**    **Damages**

66. Plaintiff pulled the credit reports at issue at a cost for access to the report, after the dispute process, specifically for the sole purpose of verifying that the inaccuracies were fixed.

67. As a result of the incorrect reporting, Plaintiff has also suffered emotional harm and excessive stress resulting in doubt as to the effectiveness of the Fair Credit Reporting Act and the power of this Court to preserve her right to a complete and accurate credit report.

//

68. Charged-off debts are far more injurious to a credit score than a debt paid in full. As payment history (including payment status) makes up thirty-five percent (35%) of a consumer's FICO Score, and as most lenders approve or deny credit based on a consumer's credit score (as opposed to pouring through each tradeline of every account listed to obtain context), the incorrect payment status and charge off references reported by Defendants is effectively lowering Plaintiff's credit score, which adversely affects Plaintiff's ability to obtain credit.

69. Plaintiff has been denied credit and is unable to rebuild her credit based on the inaccurate reporting by Conn.

70. Conn's actions, as alleged herein, are in direct violation of the Fair Credit Reporting Act, 15 U.S.C. § 1681s-2(b).

## FIRST CAUSE OF ACTION
### (Violation of Fair Credit Reporting Act 15 U.S.C. § 1681e(b))
### (Against Defendants and Does 1-100)

71. Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.    Equifax Failed to Assure Credit Reporting Accuracy**

72. Equifax violated 15 U.S.C. § 1681e(b) by failing to establish and/or follow reasonable procedures to assure maximum possible accuracy in the preparation of Plaintiff's credit reports and the credit files it published and maintained concerning Plaintiff.

73. Had Equifax maintained reasonable procedures to assure maximum accuracy, it would never have allowed Conn to report the account as described herein.

74. Equifax knew, or should have known, (1) that the Conn account was paid or settled for less than the full amount in April of 2020, and (2) that the account should not have been reported with a current payment status tradeline of "charge-off" on account of the settlement. Further, Equifax knew, or should have known, that this inaccurate and incomplete tradeline does not reflect *maximum possible accuracy and completeness* as required by the FCRA.

75. As a result of Equifax's violation of 15 U.S.C. § 1681e(b), Plaintiff suffered actual damages, including but not limited to: damage to reputation, embarrassment, humiliation, dissemination of inaccurate information, diminished credit and other mental and emotional distress.

//

**B.     Willful Violations**

76.     Equifax's violation, as described herein, was willful; specifically, the Credit Bureaus, including Equifax, have intentionally and purposefully set up a system where inaccuracies are not only probable, but inevitable.

77.     Equifax regularly, as a policy, ignores disputes by consumers and fail to perform even a basic investigation regarding the dispute. Additionally, Equifax regularly fails to forward disputes to data furnishers, thereby frustrating the entire dispute process.

78.     To the extent Equifax does send consumer disputes, it sends these disputes to employees who do not live within the continental United States to hide or subvert a consumer's liability to confront the individual(s) directly responsible for approving accurate reporting.

79.     Equifax's employees receive little to no training concerning how to accurately report consumer debt.

80.     Instead, Equifax's employees are instructed to parrot whatever information a data furnisher provides regardless of whether the information is accurate.

81.     Equifax's employees are regularly expected to review and approve over ninety (90) disputes per day, rendering less than five (5) minutes to review, investigate, and respond to each dispute received.

82.     Equifax has intentionally set up this system in order to undermine, hide, and otherwise frustrate consumers' ability to properly dispute and correct credit reports.

83.     As a result of Equifax's violation of 15 U.S.C. § 1681e(b), Plaintiff suffered actual damages, including, but not limited to: damage to reputation, embarrassment, humiliation, dissemination of inaccurate information, diminished credit, and other mental and emotional distress.

84.     Equifax's violation was willful, rendering it liable for punitive damages in an amount to be determines by the Court pursuant to 15 U.S.C. § 1681n.

85.     In the alternative, Equifax was negligent, which entitles Plaintiff to recover under 15 U.S.C. § 1681o.

86.     Plaintiff is entitled to recover actual damages, statutory damages, costs and attorneys' fees from Equifax in an amount to be determined by this Court pursuant to 15 U.S.C. § 1681n and § 1681o.

//

## SECOND CAUSE OF ACTION

**(Violation of Fair Credit Reporting Act 15 U.S.C. §§ 1681s-2(b) and 1681i(a)(1))**

**(Against Defendants and Does 1-100)**

87. Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A. Conn Failed to Reinvestigate Following Plaintiff's Dispute**

88. Pursuant to 15 U.S.C. §§ 1681s-2(b) and 1681i(a)(1), data furnishers are prohibited from providing any information relating to a consumer to any CRA if it knows, or has reasonable cause to believe, that the information is inaccurate or misleading and requires data furnishers to update and/or correct inaccurate information after a CRA notifies it of a consumer dispute.

89. Conn violated 15 U.S.C. § 1681s-2(b) by failing to conduct a reasonable investigation and re-reporting misleading and inaccurate account information.

90. Equifax provided notice to Conn that Plaintiff was disputing the inaccurate and misleading information; however, Conn failed to conduct a reasonable investigation as required by the FCRA.

91. Based on Plaintiff's dispute and review of the Payoff Letter, Conn should have known its account was paid or settled less than the full amount and ceased its inaccurate reporting.

92. The lack of investigation by Conn, as required by the FCRA, is unreasonable.

**B. Willful Violations**

93. Plaintiff further alleges that Conn has not properly trained those directly investigating disputes on Metro 2 generally or credit reporting industry standards and, as such, have developed reckless policies and procedures.

94. Plaintiff alleges that rather than train its employees on accurate credit reporting and industry standards, Conn's employees tasked with reviewing disputes are expected to confirm the information being reported as accurate instead of investigating the reporting.

95. Creditors like Conn commonly use credit reporting as a means of deemed "retribution" upon consumers who do not or cannot pay. Thus, Plaintiff alleges Conn's reporting as described herein is an attempt to have the most detrimental impact on her FICO Score, and, due to the factors and weights which comprise a FICO Score, is succeeding in doing so by its reporting of derogatory charge off notation.

//

96. In addition, the Payoff Letter specifically addresses Conn's reporting to the credit bureaus by stating it would report the account "…to all three major credit reporting agencies as Account Paid in Full for Less than the Full Balance." Reporting "Charge off" when Conn clearly had knowledge of how to accurate report the account further shows willfulness on its part.

97. In the alternative, Conn was negligent, which entitles Plaintiff to recover under 15 U.S.C. § 1681o.

C. **Equifax Failed to Reinvestigate the Disputed Information in violation of 15 U.S.C. § 1681i(a)(1)**

98. Pursuant to 15 U.S.C. 1681i(a)(1), Equifax was required to conduct a reasonable investigation and to delete any information that was not accurate after receiving notice of Plaintiff's dispute regarding the Conn account.

99. Thus, Equifax failed to conduct a reasonable investigation and correct the misleading and/or inaccurate statements on the accounts within the statutory time frame.

100. Equifax is not a passive entity bound to report whatever information a data furnisher provides.

101. Plaintiff alleges Equifax is readily familiar with Metro 2 guidelines and credit reporting industry standards.

102. Based on the foregoing, Plaintiff alleges that Equifax can, and does, suppress inaccurate information from being reported when data furnishers provide inaccurate information.

103. Equifax can and does instruct data furnishers on how to properly report certain accounts from time to time upon request from a data furnisher.

104. Equifax failed to conduct a reasonable investigation because any basic investigation would have uncovered that Conn was not reporting the accounts at issue correctly.

105. Had Equifax conducted a proper investigation, it could have closed or bookended the Conn debt by adding a notation on the credit report to show that the debt was in fact paid or settled for less than the full amount.

106. Equifax continued to report the account with a current payment status of "Charge off".

107. Equifax, therefore, did not conduct even the most basic investigation regarding credit reporting industry standards, otherwise the aforementioned would have been uncovered.

//

## THIRD CAUSE OF ACTION

### (Violation of Fair Credit Reporting Act 15 U.S.C. § 1681i(a)(4))

### (Against Defendants and Does 1-100)

108. Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.  Equifax Failed to Review and Consider all Relevant Information**

109. Equifax violated 15 U.S.C. § 1681i(a)(4) by failing to review and consider all relevant information submitted by Plaintiff.

110. Specifically, Plaintiff provided a copy of the Payoff Letter she received from Conn as evidence of their inaccurate reporting; however, Equifax failed to review and consider this relevant information.

111. Equifax's violation of 15 U.S.C. § 1681i(a)(4) has caused Plaintiff to suffer actual damages, including, but not limited to: damage to reputation, embarrassment, humiliation, and other mental and emotional distress.

**B.  Willful Violations**

112. Equifax's violation was willful, rendering it liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

113. In the alternative, Equifax was negligent in failing to review and consider all relevant information Plaintiff submitted, which entitles Plaintiff to recovery under 15 U.S.C. § 1681o.

114. Plaintiff is entitled to recover actual damages, statutory damages, costs and attorneys' fees from Equifax in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

//
//
//
//
//
//
//
//

## FOURTH CAUSE OF ACTION

### (Violation of Fair Credit Reporting Act 15 U.S.C. § 1681i(a)(5)(A))

### (Against Defendants and Does 1-100)

115. Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.   Equifax Failed to Delete Disputed and Inaccurate Information**

116. Equifax violated 15 U.S.C. § 1681i(a)(5)(A) by failing to promptly delete the disputed inaccurate items of information from Plaintiff's credit file or modify the item of information upon a lawful reinvestigation.

117. Equifax's violation of 15 U.S.C. § 1681i(a)(5)(A) has resulted in Plaintiff suffering actual damages, including, but not limited to: damage to reputation, embarrassment, humiliation, and other mental and emotional distress.

**B.   Willful Violations**

118. Equifax's violation was willful, rendering it liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

119. In the alternative, Equifax was negligent, which entitles Plaintiff to recovery under 15 U.S.C. § 1681o.

120. Plaintiff is entitled to recover actual damages, statutory damages, costs and attorneys' fees from Equifax in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

//
//
//
//
//
//
//
//
//
//
//

## PRAYER FOR RELIEF

121. WHEREFORE, Plaintiff prays for judgment as follows:

    a. For preliminary and permanent injunctive relief to stop Defendants from engaging in the conduct described above;

    b. Award statutory and actual damages pursuant to 15 U.S.C. § 1681n;

    c. Award punitive damages in order to deter further unlawful conduct pursuant to 15 U.S.C. § 1681n;

    d. Award attorneys' fees and costs of suit incurred herein pursuant to 15 U.S.C. §§ 1681n and 1681o;

    e. For determination by the Court that Defendant's policies and practices are unlawful and in willful violation of 15 U.S.C. § 1681n, *et seq.*; and

    f. For determination by the Court that Defendant's policies and practices are unlawful and in negligent violation of 15 U.S.C. § 1681o.

Respectfully submitted,

**SCHUMACHER LANE PLLC**

Dated: December 21, 2020

*/s/ Kyle Schumacher*
Kyle Schumacher
Attorney for Plaintiff

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands trial of this matter by jury.

**SCHUMACHER LANE PLLC**

Dated: December 21, 2020

*/s/ Kyle Schumacher*
Kyle Schumacher
Attorney for Plaintiff